**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  **v.**                                              **Case No. 19-CR-73**

**LUIS ARIAS**
        **Defendant.**

---

## MEMORANDUM OPINION

Defendant Luis Arias pleaded guilty to two counts of distribution of 500 grams or more of cocaine based on incidents occurring on April 3, 2019, and April 16, 2019. The pre-sentence report ("PSR") included as relevant conduct amounts dating back to 2009. Inclusion of these amounts increased the base offense level from 28, U.S.S.G. § 2D1.1(c)(6), to 34, U.S.S.G. § 2D1.1(c)(3). More importantly, marking the commencement of the instant offense as 2009 (rather than 2019) meant that defendant's prior sentences imposed in 1992 (from which he was released in 1995) and 1994 (from which he was released in 2003) fell within the 15 year look-back provision in U.S.S.G. § 4A1.2(e)(1); with those sentences scoring (3 points each), defendant's criminal history category increased from I to III, rendering him ineligible for the safety valve. See 18 U.S.C. § 3553(f)(1).

I held a hearing, at which the government presented testimony from co-defendant Reginald Reed, who detailed his dealings with defendant dating back over a decade. The government also submitted text messages between the two men corroborating their more recent dealings. For the reasons that follow, I conclude that the relevant conduct commenced in 2017, and that the drug weight, determined conservatively, is between 15 and 50 kg of

cocaine.

**I.**

Defendant seeks to limit the relevant conduct to his transactions with Reed in March and April 2019, which total 4 kg of cocaine.[1] The government contends that their dealings going back to 2009 should be included; doing that produces a weight of more than 50 kg of cocaine, plus several kg of heroin.

Defendant does not materially dispute the facts set forth in the PSR. While he indicates that the amounts are a bit overstated, and the time frames provided by Reed not quite accurate, he does not base his argument on that. Rather, the issue is whether the prior dealings qualify as relevant conduct under U.S.S.G. § 1B1.3.[2]

The mere fact that a defendant engaged in other drug deals is not sufficient to justify treating those transactions as relevant conduct. United States v. Crockett, 82 F.3d 722, 730 (7th Cir. 1996). Rather, those other acts must be part of the "same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2)

For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. U.S.S.G. § 1B1.3 cmt. n.5(B)(i). Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to

---

[1]The two counts of conviction involve 1 kilogram and 2 kilograms, respectively, and defendant concedes that a previous transaction for 1 kilogram in March 2019 qualifies as relevant conduct.

[2]Everyone agrees that, relevant conduct or not, the court can consider defendant's conduct dating back to 2009 under 18 U.S.C. § 3553(a).

2

each other, considering the degree of similarity of the offenses, the regularity of the offenses, and the proximity of the offenses. U.S.S.G. § 1B1.3 cmt. n.5(B)(ii). If one of these factors is absent, a stronger presence of at least one of the other factors is required. See United States v. Baines, 777 F.3d 959, 963 (7th Cir. 2015); United States v. Ortiz, 431 F.3d 1035, 1040-41 (7th Cir. 2005).

Defendant relies on two "breaks" in the dealings alleged here to make his argument. First, in October 2018, one of Reed's fellow dealers, Terrance Roby, was arrested; in response, Reed paused his sales of heroin and cocaine, and he did not resume until March 2019. Defendant cites cases indicating that such "gaps" may render conduct not relevant. See, e.g., United States v. Bacallo, 149 F.3d 717, 719-20 (7th Cir. 1998). He further contends that because this break was voluntary, rather than the result of either of the regular participants being arrested, it should be seen as breaking the chain of relevant conduct. See, e.g., United States v. Ruiz, 178 F.3d 877, 881-82 (7th Cir. 1999); United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir. 1993). Finally, defendant contends that when the dealing resumed in 2019 he used a different supplier than he had in 2018 and earlier, which also distinguishes the two periods. Cf. United States v. Burnett, 805 F.3d 787, 792 (7th Cir. 2015).

Second, defendant argues that there was a roughly four-year break in his dealing after he was diagnosed with cancer in 2011.[3] He acknowledges that this would not make him eligible for safety valve, although it would affect his criminal history, removing one of the two scored cases, and reduce his relevant conduct by about half.

While the government initially argued that defendant did not make the full disclosure

---

[3]Although he was not definitive, Reed indicated that a multi-year break in their dealing occurred from about 2013 or 2014 to about 2016.

3

required by 18 U.S.C. § 3553(f)(5), it later withdrew that argument. The issue is thus whether the pre-2019 conduct is sufficiently related to the offenses of conviction.

**II.**

Reed indicated that he met defendant in prison around 2003.[4] After he was released in 2007, Reed reconnected with defendant to make money selling drugs. In 2008, he obtained one ounce of power cocaine and several pounds of marijuana from defendant once or twice per week. In 2009, Reed began obtaining 4-5 ounces of cocaine from defendant weekly. They usually met to conduct their drug business in the parking lot of the auto parts store where defendant then worked. Eventually, Reed began obtaining 1 kg per week, sometimes more, continuing at that level for about 18 months. In 2011, their dealings became more sporadic, and from 2013 or 2014 to about 2016 they took a break.

Beginning in 2017, they again started dealing together regularly, with defendant providing cocaine (up to 1 kg every one to two weeks) and heroin (25 grams to start, later increasing to 1 kg), with their dealings continuing into the fall of 2018. They usually met to conduct their business in the parking of the auto parts store where defendant worked at that time.

In October or November 2018, Reed's associate Roby was arrested,[5] and Reed decided to take a break due to fear that he too would be apprehended (perhaps with Roby's assistance). The text messages presented by the government suggest that the last drug-

---

[4]I base the following findings on Reed's statement to investigators and on his testimony in court. Based on his demeanor and the general consistency of his statements, I found Reed credible. I do not understand defendant to argue otherwise.

[5]Court records show Roby's arrest occurred in October 2018, but it appears Reed became aware of it in November 2018.

4

related contact between Reed and defendant occurred on or about November 10, 2018. (Ex. A.) Their next drug related communication occurred on or about February 23, 2019,[6] with this discussion involving marijuana. (Ex. D, E.) In March 2019, they recommenced their cocaine dealings. (Ex. G.)

Reed estimated that from 2009 to 2019 he obtained about 50-100 kg of cocaine and about 3 kg of heroin from defendant.

**III.**

The evidence shows a regular and consistent course of cocaine dealing between defendant and Reed from (at least) 2017 to April 2019. While there may be some variance in the specifics, there is a consistent connection between these two men and the substance distributed. This is not a case like Ortiz, where the alleged relevant conduct involved the defendant's dealing with entirely different people, operating in a different area, from the offenses of conviction. 431 F.3d at 1042. Also unlike this case, the informant upon whom the government relied for the relevant conduct in Ortiz could not provide specific dates. Id. at 1041. Here, Reed provided specifics, which were corroborated by text messages.

Nor is this case like Bacallo, 149 F.3d 717, where the informant could not say when one of the subject transactions occurred, such that it could have been as much as 18 months before the defendant's arrest, id. at 720, and where the other transaction involved completely different accomplices, id. at 721. Nor is there a wide discrepancy in the amounts involved in the alleged relevant conduct as compared to the offenses of conviction. See Ortiz, 431 F.3d at 1042. Defendant regularly provided Reed with 1 kg amounts of cocaine from 2017 to 2019.

---

[6]The two men did exchange holiday greetings in the interim.

Defendant primarily relies on the break from late 2018 to early 2019, but that gap is not as significant as it might seem. The texts suggest the gap in contacts was from November 2018 to February 2019, which seems like a blip given the years-long relationship demonstrated here. While it does appear the first actual meeting about cocaine in 2019 happened in March, the cessation of contacts was closer to 3-4 months, which is shorter than in the cases defendant cites and which were cited in Ortiz, 431 F.3d at 1041. See also United States v. Delatorre, 406 F.3d 863, 866-67 (7th Cir. 2005) (finding relevant conduct despite a three year gap).

One of the cases upon which defendant relies for his voluntary cessation argument, Ruiz, 178 F.3d at 881-82, involved an unexplained two year gap. Here, the gap is much shorter, and it is explained – by Reed's skittishness after his co-actor Roby was arrested. It appears that Reed was willing to return to his regular course of cocaine dealing when he perceived the law enforcement scrutiny had abated. In other words, this is not a situation where the players voluntarily decided to stop dealing drugs for reasons unrelated to law enforcement action. Cf. Cedano-Rojas, 999 F.2d at 1180 ("A respite is unlikely to be fatal in the finding of a course of conduct if the interruption was not the choice of the players.").

In any event, even if the proximity factor works against the government, there is a regular course of dealing between these two men, primarily involving cocaine, from 2017 to 2019. The evidence also shows similarity in the manner in which the deals were consummated. In sum, the evidence shows that defendant dealt with the same accomplice (Reed), supplying the same drug (cocaine), and in the same transaction locations (in and around Milwaukee, often near defendant's workplace). A gap of a few months, given that the overall relationship lasted years, is not sufficient to defeat the showing of the relevant conduct. See Baines, 777 F.3d at 964

(finding relevant conduct despite temporal gap given common factors: same principal and accomplice, location, and drug facts).

I have considered defendant's argument that he obtained the drugs from different suppliers in 2018 and 2019, and while that it is a relevant factor, it also does not defeat the basic relationship, given the other similarities (and the regularity of dealing from 2017 to 2019). See United States v. Tankson, 836 F.3d 873, 885 (7th Cir. 2016). Defendant's evidence shows that he obtained drugs from several sources over the years: "Jose" in the earlier years (2009-11), followed by a break after he got sick; after he reconnected with Reed in 2017, defendant was supplied by "Jose" and "Carlos"; in 2018, defendant obtained cocaine from "Orlando"; and in 2019, he obtained cocaine from "Mexico."

However, the basic nature of the transactions was the same: Reed could contact defendant for drugs, defendant would obtain them from his current supplier, and they would complete the transactions in the same or similar fashion in Milwaukee. Not everything has to be identical to be relevant conduct. See United States v. Lomax, 712 F.3d 1087, 1090 (7th Cir. 2013) (affirming a relevant conduct finding where the defendant regularly sold both powder and crack cocaine in two Illinois locations using two different suppliers over the same period of time); United States v. Singleton, 548 F.3d 589, 592 (7th Cir. 2008) ("Despite the fact that the charged and uncharged offenses involved different participants and different amounts, the uncharged conduct involved the same principal, the same location, and the same drug-facts that render it similar enough to the offense of conviction to show that [the defendant] was engaging in an ongoing pattern of conduct.").

Finally, while I agree with the government that defendant's relevant conduct must include more than the March/April 2019 activity, I decline to include the amounts distributed from

7

2008/2009 to 2017.  While Reed testified to consistent cocaine transactions in 2009-11, he explained that his dealings with defendant were sporadic from 2011 to 2013, and stopped entirely from 2013/2014 to 2016.  While a multi-year gap does not alone defeat a showing of relevant conduct, a stronger showing under the other factors would then be required.  See Delatorre, 406 F.3d at 867 (finding that while a three-year gap "gives us pause," the offenses were otherwise substantially the same, involving the same two actors and a common supplier).  Here, there are differences in suppliers and specific locations, as discussed above.  While those differences did not defeat relevance in the context of the three to four month gap from November 2018 to March 2019, they cannot be overlooked in the context of a three to four year gap.

**IV.**

For the reasons stated, I will adopt a final offense level of 29, criminal history category of II, and a guideline range of 97-121 months.

Dated at Milwaukee, Wisconsin, this 4th day of December, 2019.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

8